NOT FOR PUBLICATION                              (Docket Nos. 17, 20)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

```
_____
                               :
S.A., et al.,                  :
                               :
            Plaintiffs,        :     Civil No. 04-4710(RBK)
                               :
      v.                       :     OPINION
                               :
RIVERSIDE DELANCO SCHOOL       :
DISTRICT BOARD OF EDUCATION,   :
                               :
            Defendant.         :
_____:
```

**KUGLER,** United States District Judge:

    This matter comes before the Court on motion by Plaintiffs
S.A., et al. ("Plaintiffs"), for reasonable attorney fees and
costs as a prevailing party under the Individuals with
Disabilities Education Act ("IDEA") pursuant to 20 U.S.C. §
1415(i)(3)(B), and motion by Defendant Riverside-Delanco School
District Board of Education ("Board" or "Defendant") to reverse
the final administrative decision on the record below to the
extent that it holds that placement at Burlington County Special
Services School District is inappropriate and orders the Board to
enroll G.A. in a program employing the techniques of applied
behavior analysis and discrete trial training. For the reasons
set forth below, Defendant's motion for summary judgment will be
denied and Plaintiffs' motion for attorney fees and costs will be

granted.

## I.   Background

G.A., born January 9, 2001, is a disabled child diagnosed with autistic spectrum disorder. (P.A. Tr., May 13, 2004, at 79:20-24.) He exhibits a number of challenging behaviors, including disrobing, fecal smearing, stuffing his mouth with food, eloping, biting, and general obsessive conduct, and he has almost no use of verbal language. (Admin. Order, July 16, 2004 ("Admin. Order"), at 2; S.A. Cert., filed June 27, 2005, at ¶ 4.) The Board's child study team found G.A. eligible for special education and developed an individualized education plan ("IEP") to provide him with a preschool program in compliance with the IDEA. (Admin. Order at 4.) The IEP, finalized on December 23, 2004, proposed placement in a half-day class at Burlington County Special Services School District ("BCSSSD"). The IEP also called for twenty minutes of speech therapy three times per week, thirty minutes of occupational therapy two times per week, and a one-to-one shadow aide.[1]

G.A.'s parents considered the BCSSSD program inadequate for G.A.'s needs and filed for a due process hearing before an administrative law judge ("ALJ"). In particular, they believed

---

[1] Although the IEP did not explicitly provide that the shadow aide would be individual, witness testimony and Judge Gorman's findings suggest that the one-on-one nature of the aide was assumed by the parties. (Admin. Order at 3.)

that G.A. required a full-day program employing applied behavior analysis ("ABA") methodology as implemented by a technique known as discrete trial training ("DTT"),[2] and claimed that both of G.A.'s examining doctors, Drs. Carlo B. Melini and Anna Baumgaertel, recommended a program utilizing ABA. Specifically, Dr. Melini, a specialist in Developmental Pediatrics who initially diagnosed G.A. with autistic spectrum disorder in July 2003, concluded, during a follow-up visit in January 2004, that G.A. required an autistic class with a full day of ABA and DTT. (Admin. Order at 2-3; Haas-Givler Tr., Apr. 20, 2004, at 54-55:21-5.) After evaluating G.A. in October 2003, Dr. Baumgaertel noted that G.A. had shown a "good response" to ABA and recommended increasing the ABA to fifteen hours a week. (Admin. Order at 2-3; Haas-Givler Tr., Apr. 20, 2004, at 14:19-25.)

On July 16, 2004, after four days of hearings, ALJ Bruce M. Gorman ("Judge Gorman") issued an administrative decision rejecting the BCSSSD program. Judge Gorman concurred with Defendant that a half-day transitional program of approximately six months would be appropriate before G.A. would be ready for a full day program. (Admin. Order at 11.) However, the ALJ also found that BCSSSD could not satisfy G.A.'s needs for a program

---

[2] Although unclear from the record, the briefs, and prior case law, it appears that ABA is a general teaching method and DTT is a specific technique employed in the ABA approach. (Haas-Givler Tr., Apr. 20, 2004, at 63:21-24.)

grounded on ABA and DTT techniques. The ALJ's decision rested primarily on the testimony of the Board's expert witness, behavioral specialist Barbara Haas-Givler, the Board's Child Study Team leader Patricia Eastwood, and Plaintiffs' expert witness Dr. Justin DiDomenico. Because he found neither of the experts entirely credible or compelling,[3] Judge Gorman ascertained "the minimum necessary" to provide G.A. a free appropriate public education ("FAPE") by looking to the areas of agreement between Haas-Givler and DiDomenico. (Admin. Order at 9.) In so doing, he found that both experts concurred that G.A. requires ABA and DTT. (Admin. Order at 10, 7, 6.)

Based on the experts' testimony, the ALJ concluded that a program lacking ABA/DTT could not meet the FAPE standard set forth by the Supreme Court in <u>Board of Education of Hudson Central School District v. Rowley</u>, 458 U.S. 176 (1982). Judge Gorman noted that the IEP did not provide for the particular implementation of ABA or DTT, or address hyperactivity, fecal smearing, biting, elopement, or undressing. (Admin. Order at 4;

---

[3] To explain why he found neither expert entirely credible, Judge Gorman observed that Haas-Givler is widely experienced in general, but has a very limited background with pre-school children. Moreover, she wrote her report without personally observing G.A. (Admin. Order at 10.) The ALJ found that DiDomenico, on the other hand, was very knowledgeable, but lacked important practical experience and relied heavily on the Lovaas method, which is still disputed in scientific circles. (Admin. Order at 10.)

P.A. Tr., May 13, 2004, at 73:1-10.) He emphasized that although the BCSSSD teachers were clearly very experienced and willing to learn, no staff at BCSSSD had ABA or DTT training, nor were they trained specifically in educating autistic children. (Admin. Order at 6, 10.) Judge Gorman found further that even if the staff did receive training, such instruction would take two and a half months and then G.A. would be the "guinea pig" for the implementation of the new methodology. (Admin. Order at 11.)

After Judge Gorman issued his decision, Plaintiffs filed a request for fees and costs as a prevailing party under 20 U.S.C. § 1415(i)(3)(B) with this Court on September 23, 2004. Defendant counterclaimed for reversal of the ALJ's decision to the extent that the ALJ found the BCSSSD program inadequate.

## II. IDEA and Standard

The IDEA obliges states in receipt of federal funding under the statute to guarantee a FAPE to all children with disabilities. 20 U.S.C. § 1412(a)(1)(A). The IDEA instructs states to develop a detailed instructional plan, known as an IEP, for every disabled child. 20 U.S.C. § 1412(a)(4). The IEP is specially designed for each child, consisting of "a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." Holmes v. Millcreek Twp. School Dist., 205 F.3d 583,

589-90 (3d Cir. 2000) (citing 20 U.S.C. § 1401(a)(20)).

In defining the contours of FAPE, the Supreme Court explained that the disabled child is entitled to "such services as are necessary to permit the child 'to benefit' from the instruction." Board of Ed. of Hudson Cent. School Dist. v. Rowley, 458 U.S. 176, 188-189 (1982). The IEP must provide a "'basic floor of opportunity,' but not necessarily 'the optimal level of services.'" Holmes, 205 F.3d at 589-90 (quoting Carlisle Area School v. Scott P., 62 F.3d 520, 533-34 (3d Cir. 1995)). However, "although the state is not required to 'maximize the potential of handicapped children,' . . . a satisfactory IEP must provide 'significant learning' and confer 'meaningful benefit.'" T.R. v. Kingwood Twp. Bd. Of Educ., 205 F.3d 572, 577 (3d Cir. 2000) (noting that the Third Circuit rejected as inadequate the "more than trivial or de minimis" standard of Polk v. Central Susquehanna Interm. Unit 16, 853 F.2d 171, 180-85 (3d Cir. 1988)).

The burden of establishing the inadequacy of a proposed IEP rests on the challenging party, typically the parents of the disabled child. Schaffer v. Weast, --- U.S. ----, 126 S. Ct. 528, 537 (2005); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 391 (3d Cir. 2006). Until recently, the school district was obligated to demonstrate that a challenged IEP provided the requisite FAPE, T.R., 205 F.3d at 579; however, the United States Supreme Court

recently determined that the burden of demonstrating noncompliance with the IDEA more properly rests upon the party seeking relief.[4] <u>Schaffer</u>, 126 S. Ct. at 537.

## III. Review of ALJ's Decision

In reviewing an administrative determination in an IDEA case, "the District Court applies a modified version of <u>de novo</u> review." <u>L.E.</u>, 435 F.3d at 389 (citing <u>S.H. v. State-Operated Sch. Dist. of the City of Newark</u>, 336 F.3d 260, 269-70 (3d Cir. 2003)). While "the District Court must make its own findings by a preponderance of the evidence," the court "must also afford 'due weight' to the ALJ's determination." <u>Shore Reg'l High School Bd. of Educ. v. P.S. ex rel. P.S.</u>, 381 F.3d 194, 199 (3d Cir. 2004) (citing 20 U.S.C. § 1415(1)(2)(B)(iii); <u>Rowley</u>, 458 U.S. at 206). Thus, "[f]actual findings from the administrative proceedings are to be considered prima facie correct," and where the ALJ has heard live testimony and made determinations of credibility, "that determination is due special weight." <u>Id.</u> (citing <u>S.H. v. State-Operated School Dist. of Newark</u>, 336 F.3d 260, 271 (3d Cir. 2003)). Furthermore, "[i]f a reviewing court fails to adhere to [the ALJ's findings], it is obliged to explain why." <u>Id.</u>

---

[4] Because Judge Gorman issued his opinion before the Supreme Court's decision in <u>Schaffer</u>, 126 S. Ct. at 537, he applied the pre-<u>Schaffer</u> standard, improperly placing the burden upon the Board to establish the adequacy of the IEP. Nevertheless, this Court now finds that a preponderance of the evidence supports his decision under either standard.

The Board requests reversal of Judge Gorman's rejection of the BCSSSD program and, more specifically, his conclusion that G.A. requires a program grounded in ABA/DTT. Defendant contends the ALJ failed to accord the educators the deference that was their due, improperly permitting G.A.'s parents to impose their preferred methodology on the Board. In support, Defendant cites a number of cases that deem it inappropriate for parents to demand specific techniques, such as DTT, in their child's IEP.

This Court agrees with Judge Gorman that the most compelling factor here is the testimony of both Defendant's and Plaintiffs' experts that G.A. requires ABA methodology and DTT techniques. This testimony is sufficient to establish by a preponderance of the evidence that G.A. requires a program employing ABA and DTT, rendering the Board's IEP insufficient for its failure to provide for such a program. Accordingly, the administrative decision will be affirmed.[5]

---

[5] Although this Court will uphold the administrative determination, it should be noted that the opinion below is not entirely unproblematic. In particular, while Judge Gorman did articulate the correct standard for evaluation of an IEP (i.e., what is "the minimum necessary to satisfy FAPE," or, more colloquially, "whether BCSSS is a Ford"), (Admin. Order at 10, 9), he was not wholly consistent in its application. For example, to conclude that a program without ABA/DTT would be inadequate, the ALJ notes that both experts "concur that the *best approach* involves" the use of these techniques, thereby deviating from the characterization of FAPE as a floor of opportunity. (Admin. Order at 10) (emphasis added).

Moreover, the administrative opinion occasionally conflates DTT and ABA, without adequately distinguishing between the two. Most significantly, while the ALJ rejected the Lovaas approach as

Because the IDEA does not obligate schools to provide "the optimal level of services," Holmes, 205 F.3d at 589-90, parents may not demand a program founded on a "competing educational theory," such as ABA, where the IEP already provides for education that will meaningfully benefit the child. Alexander K. v. Virginia Bd. of Ed., 30 IDELR 967, 970 (E.D. Va. 1999). This does not suggest that parents can never demand a technique such as DTT for their child, but rather that they cannot do so when a board of education offers an appropriate alternative, Adams v. State of Oregon, 195 F.3d 1141, 1147 (9th Cir. 1999). No case stands for the proposition that an IEP could be adequate where it does not provide for teaching techniques required by the child.[6]

---

insufficiently established in scientific circles, (Admin. Order at 10), he does not acknowledge that DTT is also an element of this approach.

These issues notwithstanding, the Court now finds that Plaintiffs have established G.A.'s need for ABA/DTT by a preponderance of the evidence.

[6] Defendant relies heavily on The Honorable Jerome B. Simandle's Opinion of Feburary 15, 2002, in Deptford Township School District v. H.B., (01-0784), which upheld an IEP that did not explicitly provide for DTT techniques where the student required DTT. However, in so deciding, Judge Simandle emphasized that "H.B. received DTT instruction at CDC and would have continued receiving DTT instruction at CDC," even though DTT was not provided for in the IEP (Deptford Op., Feb. 15, 2002, at 29.) (emphasis added). In particular, Judge Simandle found that "the record demonstrates by a preponderance of the evidence that DTT would have been incorporated in the child's instruction at CDC during the 1999-2000 school year in the same manner and quantity provided in the child's program at CDC the previous year." (Deptford Op., Feb. 15, 2002, at 31.) Here, unlike Deptford, there was no past practice to indicate what further services the Board would provide.

Not surprisingly, Plaintiff's expert, Dr. DiDomenico, an authority on ABA/DTT techniques, testified that he personally observed the BCSSSD program and concluded it would confer "no educational benefit" on G.A. (DiDomenico Tr., May 13, 2004, at 52:8.) Specifically, he observed, "[t]he skills that they are teaching in that class . . . maybe for the other students those are valuable," but that they would not benefit a student such as G.A. who requires teaching in very discrete lessons. (DiDomenico Tr., May 13, 2004, at 52:10-21.) He also expressed concern that all the BCSSSD students participated in the same activities and the activities were not individually structured as they were in other programs. (DiDomenico Tr., May 13, 2004, at 55:17-25.)

Most revealing, however, is the testimony of the Board's expert, Haas-Givler, who agreed that ABA "is an important facet of any program designed for G.A."[7] (Haas-Givler Tr., Apr. 20, 2004, at 126:14-17.) Haas-Givler conceded that the IEP should provide for a behavior specialist to oversee the ABA/DTT and in-

---

[7] As the ALJ noted, Haas-Givler's answers often tended towards vagueness. When asked if the teachers working with G.A. should get ABA training, for example, Haas-Givler responded:
> I think it could be done in conjunction when he's work—they're working him. They have staff. Mr. Root mentioned that there was someone within the ed services unit that he knew—he knew of; did not know who the person was but he's heard that there are other people that are doing that services through and so he, you know, I would think that there should be people available and accessible.

(Haas-Givler Tr., Mar. 31, 2004, at 49:7-14.)

servicing for the teacher and the one-on-one aide. (Haas-Givler Tr., Apr. 20, 2004, at 144:11-14, 145:2-4.) She stated that it was very important for G.A.'s teacher and one-on-one aide to be trained in ABA and that the teacher's lack of training in ABA "needs to be addressed." (Haas-Givler Tr., Mar. 31, 2004, at 49-50:24-2; Haas-Givler Tr., Apr. 20, 2004, at 66:1-3.) Similarly, when asked if G.A. requires DTT, Haas-Givler appears to respond affirmatively that G.A. could receive "discreet trials in the classroom, in the library, in different settings." (Haas-Givler Tr., Mar. 31, 2004, at 54:11-13.)

However, as Haas-Givler also acknowledged, the IEP did not provide for an ABA program, much less for supervision of the program. Vince Root, the teacher of the class where G.A. would be placed under the IEP, was not trained in working with children with autism, did not have training in ABA, and was not familiar with DTT. (Haas-Givler Tr., Apr. 20, 2004, at 11:10-21.) Nor did the IEP provide for staff training in ABA. (Haas-Givler Tr., Apr. 20, 2004, at 28:18-20; Eastwood Tr., Apr. 20, 2005 at 196:12-14.)

Furthermore, Haas-Givler emphasizes the importance of enlisting an individual familiar with applied behavior techniques to oversee G.A.'s program. (Haas-Givler Tr., Apr. 20, 2004, at 33:19-21, 35:5-11, 21-24.) In particular, she qualified her testimony in favor of BCSSSD by noting that it would be appropriate "[w]ith the provision of supervision of the ABA

Program," (Haas-Givler Tr., Apr. 20, 2004, at 76:9-12), and that
G.A. would need a "psychologist with a strong behavioral
background" to provide "some ongoing support to monitor" the
aide, and "to monitor and make sure they're using the techniques
properly." (Haas-Givler Tr., Apr. 20, 2004, at 135:8-25.) Instead
of an individual trained in ABA or DTT, however, G.A.'s program
would be overseen by Eastwood, the district's learning disability
teaching consultant, who had no special training in dealing with
autistic children and no background in DTT or ABA. (Eastwood Tr.,
Mar. 31, 2004, at 183:2-6, 183:7-20.)

Although Defendant cites numerous cases, the Board points to
no authority that upholds an IEP that does not provide for a
methodology deemed necessary by all testifying experts. Despite
the Board's assertions to the contrary, this case is not
comparable to the situation in Alexander K., 30 IDELR at 970,
where the parents rejected an IEP that would address the child's
specific needs in favor of a preferred alternative educational
methodology. Nor is the present scenario comparable to Adams, 195
F.3d at 1147, where the IEP provided DTT as a "substantial, but
not exclusive" part of a greater program because the district
"did not want to be limited only to discrete trial training,
although that methodology would be implemented as part of the
overall program." Id. at 1147. Nor is G.A.'s situation similar to
Burilovich v. Board of Ed. of Lincoln Consol. Schools, 208 F.3d

560, 571-72 (6th Cir. 2000), where experts concluded that DTT would emphasize the student's "deficits, not his strengths," and would isolate the student in a way that "would only make his social relationships worse." Here, both experts have stated that G.A. required an ABA program, but the Board nevertheless declined to provide for the implementation, training, or supervision necessary to administer the methodology.

Lastly, Defendant argues that the ALJ was incorrect to specifically mandate DTT techniques since DTT is only one form of ABA. The Board emphasizes that techniques known as the Treatment and Education of Autistic and Communication Handicapped Children ("TEACCH") is another form of ABA, and notes that some of the BCSSSD staff are trained in TEACCH. However, because G.A.'s teacher at BCSSSD was not trained in TEACCH and the IEP did not provide for any interaction between G.A. and TEACCH-trained staff, the use of TEACCH techniques in some BCSSSD classrooms does not resolve G.A.'s need for ABA or compensate for the deficient IEP. (Haas-Givler Tr., Apr. 20, 2004, at 29:14-18; 139:14-23.)

Accordingly, the administrative decision will be affirmed.

## IV.  Attorney Fees

20 U.S.C. § 1415(i)(3)(B) authorizes courts to grant an award of reasonable attorney fees to parents of disabled children who prevail in contesting an IEP. The fee calculation is "based

13

on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415 (i)(3)(c). That rate is then utilized to calculate a "lodestar" by "multiplying [the] reasonable hourly rate by a reasonable number of hours." Reid ex rel. Reid v. School Dist. of Phila., 2005 WL 174847, *2 (E.D. Pa. 2005). The burden rests on the party requesting the award to establish the "reasonableness" of the "hourly rate and number of hours." Washington v. Philadelphia County Ct. of C.P., 89 F.3d 1031, 1035 (3d Cir. 1996) (citing Blum v. Stenson, 465 U.S. 886, 895-96 n.11 (1984)).

To satisfy this burden, "the fee petitioner must 'submit evidence supporting the hours worked and rates claimed.'" Interfaith Cmty. Org. v. Honeywell Intern., Inc., 426 F.3d 694, 703 n.5 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)). To challenge the fee request, "the opposing party must then object 'with sufficient specificity' to the request." Id. The court should exclude any hours found to be "excessive, redundant, or otherwise unnecessary." Reid, 2005 WL 174847, *2 (E.D. Pa. 2005) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)).

Plaintiffs request reimbursement of $44,924.04 in attorney fees and costs and $2,487.50 for expert expenses, for a total of $47,411.54. In support of Plaintiffs' request for fees,

14

Plaintiffs' attorney Staci J. Greenwald, Esquire, filed a Certification of Services certifying that she has a rate of $250.00/hour, which has been approved by boards of education in prior cases. (Greenwald Cert., filed June 27, 2005, at ¶ 4). Robin S. Ballard, Esquire, who also assisted with Plaintiffs' case, filed a separate Certification attesting an hourly rate of $225.00/hour. (Ballard Cert., filed June 27, 2005, at ¶ 4.) In support of these rates, Plaintiffs provided the Certification of special education attorney Monica Dodd Palestis, Esquire, to verify that these fees are customary. (Palestis Cert., filed June 27, 2005, at ¶ 4.) Plaintiffs also provided a "computer generated Timeslips® bill," enumerating billed activities for a total of 185.35 hours. (Greenwald Cert., filed June 27, 2005, Ex. 1.)

Defendant contests Plaintiffs' fee calculations on two grounds: Plaintiffs' fee award should be discounted (1) to the extent Plaintiffs did not prevail on the record below, and (2) for failure to document hours with sufficient specificity. Because the Court now finds these arguments unconvincing, Plaintiffs will receive a full award of $47,411.54.

## A.    Discount for Partial Success

The Board does not contest Plaintiffs' partial success on the record below. Defendant nevertheless requests a diminution of the award to the extent that Plaintiffs demanded a full-day program for G.A., since the ALJ ultimately concluded that G.A.

required only a half-day program. Plaintiffs contend that the litigation centered around the appropriateness of the BCSSSD placement and characterize the program length as a secondary issue.

In calculating fee awards, courts are instructed to "reduce the hours claimed by the number of hours spent litigating claims on which the party did not succeed and that were 'distinct in all respects from' claims on which the party did succeed.'" Washington, 89 F.3d at 1044 (quoting Rode, 892 F.2d at 1183; Murphy v. Girard School Dist., 134 F. Supp.2d 431, 433 (W.D. Pa. 1999) (reducing fee award in IDEA case to reflect limited success where court ultimately concluded that "no special education placement was warranted"). Such a reduction may be proper "even where the plaintiffs' claims were inter-related, nonfrivolous, and raised in good faith." Hensley, 461 U.S. at 436. However, where "a Plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," even if "the plaintiff failed to prevail on every contention raised in the lawsuit." Hensley, 461 U.S. at 435; Failla v. City of Passaic, 146 F.3d 149, 160 n.15 (3d Cir. 1998) (holding where plaintiffs' claims significantly validated, no need to reduce lodestar to reflect limited success).

To assess whether a partial victory may reasonably entitle plaintiff to fees and costs, "courts look to the degree of

16

success obtained," <u>Buss v. Quigg</u>, 91 Fed. Appx. 759, 761 (3d Cir. 2004) (citations omitted), or "the extent to which the litigant was successful." <u>Washington</u>, 89 F.3d at 1043 (citing <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 440 (1983) (stating "[a] reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole")). The court should examine the unsuccessful claims and "make 'a reasoned judgment [whether] the time spent on these claims . . . justif[ies] a reduction in the fees award.'" <u>Id.</u> (quoting <u>Buss</u>, 91 Fed. Appx. at 761). The court should be mindful that where both the "successful and unsuccessful claims arise out of a common core of facts," it may be "difficult to divide the hours expended on a claim-by-claim basis." <u>Buss</u>, 91 Fed. Appx. at 761 (quoting <u>Hensley</u>, 461 U.S. at 435); <u>Warren ex rel. Orlando v. Reading School Dist.</u>, 2000 WL 122353, *1 (E.D. Pa. 2000) (declining to reduce fees for interrelated claims); <u>Fletcher v. ODonnell</u>, 729 F. Supp. 422, 430 (E.D. Pa. 1990) (same).

The Board characterizes Plaintiffs' challenge to the IEP as two distinct claims—one for a full-day program and a second for a program providing ABA/DTT—and argue that the fee award should therefore be discounted by 50% for failure to prevail on the demand for a full-day program. The Board analogizes the present case to that of <u>Washington</u>, 89 F.3d 1031, where the Third Circuit upheld the district court's reduction of attorney fees because,

although the plaintiff did prevail on his claim of retaliation, his discrimination claim was unsuccessful.

However, the comparison with <u>Washington</u> is tenuous at best, particularly as Plaintiffs' relative degree of success was far greater than that of Washington who "hardly won a decisive victory," lost five of his nine claims in summary judgment, and received only a nominal recovery on his retaliation claim. <u>Id.</u> Although they did not prevail on all of their arguments, Plaintiffs were fully successful in overturning the Board's IEP as insufficient.

Moreover, unlike <u>Washington</u> where "the alleged relatedness between the two general claims is too tenuous to support a finding of error," <u>Id.</u> at 1044, here, the issues of program length and the methodology required to provide G.A. with FAPE were intertwined in the greater issue of whether BCSSSD was an appropriate program. It is impossible to parse out the time spent litigating program length from the litigation of other issues related to the IEP's inadequacy. <u>See</u> <u>Buss</u>, 91 Fed. Appx. at 761 (upholding district court's refusal to adjust fee award for limited success because claims arose out of common core of facts rendering the amount difficult to adjust). Accordingly, Plaintiffs' fee award will not be discounted for their lack of success in obtaining a full-day program for G.A.

**B.   Discount for Insufficient Specificity**

18

Because "the court must be careful to exclude from counsel's fee request 'hours that are excessive, redundant or otherwise unnecessary,'" <u>Holmes</u>, 205 F.3d at 595 (quoting <u>Hensley</u>, 461 U.S. at 434), "[a] fee petition is required to be specific enough to allow the district court 'to determine if the hours claimed are unreasonable for the work performed,'" <u>Washington</u>, 89 F.3d at 1037 (quoting <u>Keenan v. City of Phila.</u>, 983 F.2d 459, 473 (3d Cir. 1992)). Thus, "specificity should only be required to the extent necessary for the district court 'to determine if the hours claimed are unreasonable for the work performed.'" <u>Id.</u> (quoting <u>Rode</u>, 892 F.2d 1177, 1190 (3d Cir. 1990).

In sum, Plaintiffs are required to provide:

> "some fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates." However, "it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney."

<u>Id.</u> at 1037-1038 (quoting <u>Rode</u>, 892 F.2d at 1190 (finding sufficient specificity in a computer-generated time sheet with the duration, "general nature" and "subject matter" of an activity and "the date the activity took place")). See also <u>Keenan</u>, 983 F.2d at 473 (holding "computer-generated summaries of time spent by each attorney and paralegal met the standards of <u>Rode</u>"); <u>Hall v. Harleysville Ins. Co.</u>, 943 F. Supp. 536, 544 (E.D. Pa. 1996) (holding that Plaintiffs need not "delineate the

amount of time involved to each given task").

Here, Plaintiffs have submitted a computer printout listing billed activities in chronological order and including a general description, date, and duration for each entry. These submissions provide "enough information as to what hours were devoted to various activities and by whom" for the Court to find that they are reasonable. Washington, 89 F.3d at 1038 (quoting Rode, 892 F.2d at 1191). Defendant does not argue that Plaintiffs' fee request is unreasonable or excessive. Accordingly, because Plaintiffs' request for an award of $47,411.54 is entirely accounted for in the computer records provided and is reasonable under the circumstances, Plaintiffs are entitled to the full award.

The accompanying Order shall issue today.


Dated: 3-30-06                 S/Robert B. Kugler
                          ROBERT B. KUGLER
                          United States District Judge